UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EVERQUOTE, INC., f/k/a ADHARMONICS, INC., <br><br>         Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> UNDERGROUND ELEPHANT, INC., <br><br>         Defendant/Counterclaim-Plaintiff. | CIVIL ACTION <br> NO. 16-cv-10103-WGY |

## AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. 15(a)(1)(B), EverQuote, Inc., f/k/a AdHarmonics, Inc. ("EverQuote"), a Delaware corporation, for its causes of action against defendant, Underground Elephant, Inc. ("Underground Elephant"), a California corporation, hereby submits this Amended Complaint and alleges as follows:

## THE PARTIES

1.   EverQuote is, and at all relevant times was, a corporation duly organized pursuant to the laws of the State of Delaware, with a principal place of business at 210 Broadway, Cambridge, Massachusetts.  EverQuote was registered and operated in the Commonwealth of Massachusetts as AdHarmonics, Inc. until January 12, 2015, when the entity's name was changed to EverQuote, Inc.

2.   EverQuote is informed and believes that Underground Elephant is, and at all relevant times was, a corporation duly organized and operating under the laws of the State of California with a principal place of business at 600 B. Street, Suite #1300, San Diego, California.

**JURISDICTION AND VENUE**

3. Plaintiff brings this action under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

4. Venue in this district is proper because EverQuote's principal place of business is located in Massachusetts, the services at issue were substantially performed in Massachusetts, the parties agreed under the terms of one of their agreements that any dispute arising from that agreement be brought in state or federal court in Massachusetts, and Underground Elephant has waived the forum selection clause contained in the other agreement between the parties by asserting claims under that agreement in its Counterclaim.

**FACTUAL ALLEGATIONS**

*The Business of the Parties*

5. EverQuote operates a leading online auto insurance marketplace in the United States. EverQuote's technology platform allows consumers seeking to purchase auto insurance to indicate their interest in receiving competitive rate quotes, and matches them with insurance agents and carriers interested in selling and qualified to sell auto insurance.

6. EverQuote licenses these "leads" to insurance agents and carriers interested in selling and qualified to sell auto insurance through an online auction, in which insurance agents and carriers compete for the opportunity to contact the consumer, provide them a rate quote, and sell them auto insurance. EverQuote also licenses leads to "aggregators" that acquire leads from multiple sources. These aggregators then sell the leads to insurance carriers and agents in the aggregators' distribution networks.

7. Once a lead is licensed to a particular insurance agent or carrier, either directly or through an aggregator, that insurance agent or carrier contacts the consumer directly and provides a quote for the purchase of auto insurance.

8. Underground Elephant is an aggregator in the business of purchasing leads from providers like EverQuote and then reselling those leads to insurance agents and carriers. Among other things, Underground Elephant operates an online "Allstate Lead Marketplace" where Allstate insurance agents can purchase leads for consumers interested in insurance products.

### *The January 2014 Allstate Agreement*

9. In January 2014, EverQuote (then known as AdHarmonics, Inc.) and Underground Elephant entered into a Lead Vendor Agreement pursuant to which the parties agreed that Underground Elephant would have the opportunity to license certain leads for consumers interested in purchasing insurance products and resell those leads to Allstate agents through the Allstate Lead Marketplace (the "January 2014 Allstate Agreement"). A true and correct copy of the January 2014 Allstate Agreement is attached as Exhibit A.

10. Underground Elephant agreed in the January 2014 Allstate Agreement to integrate its computerized lead processing system with EverQuote's technology platform to facilitate the automatic transmission/receipt of lead data.

11. Underground Elephant agreed in the January 2014 Allstate Agreement that EverQuote's technology platform would "ping" Underground Elephant's lead processing system with non-personally identifiable information regarding a lead meeting Underground Elephant's account parameters.

12. The January 2014 Allstate Agreement had no minimum purchase requirements, and Underground Elephant was not required to return a price. If Underground Elephant offered a

3

ping price that was acceptable to EverQuote, then EverQuote would send (or "post") the complete lead information to Underground Elephant's lead processing system.

13. Underground Elephant's lead processing system had the option in real-time during the lead post to refuse the lead for any reason or no reason at all.

14. In other words, before finalizing its license of a lead, Underground Elephant was afforded an opportunity to review all of the lead data and reject the lead. Leads rejected on post are not licensed and thus are not invoiced by EverQuote.

15. There was never any limit on the number of leads Underground Elephant could reject on post.

16. This "ping/post" model afforded Underground Elephant the opportunity to provide a price it was willing to pay for a particular lead. Underground Elephant was not required to provide a price for leads it did not want to purchase.

17. After EverQuote posted a lead to Underground Elephant, Underground Elephant had a further opportunity to review each and every lead, including all of the information in the lead, to determine whether the lead satisfied its criteria before acquiring a license to the lead and reselling it on the Allstate Lead Marketplace. Leads rejected by Underground Elephant on post were not licensed or invoiced to Underground Elephant.

18. Underground Elephant agreed in the January 2014 Allstate Agreement that it would have the right to return licensed leads to EverQuote only (a) within 30 days following the end of the month in which posting of such lead data occurred in the event of returns from Allstate and solely where Allstate rejected, returned, or received a credit for such lead data; (b) within 10 days following the end of the month in which posting of such lead data occurred in

25809659v.2

the event that an Allstate agent returned the lead data within that time frame; and (c) at any time due to fraud or intentional misconduct.

19. EverQuote invoiced Underground Elephant on a monthly basis for leads licensed by Underground Elephant, and each month, Underground Elephant would return a certain percentage of leads for various reasons. EverQuote would accept returns in accordance with the January 2014 Allstate Agreement.

20. Beginning in September 2015, Underground Elephant continued to submit returns of leads, but failed to pay amounts invoiced by EverQuote for leads licensed by EverQuote to Underground Elephant and not returned by Underground Elephant in accordance with the terms of January 2014 Allstate Agreement.

21. In December 2015, and only after EverQuote demanded payment of overdue amounts, Underground Elephant purported to return approximately 2,000 additional leads posted by EverQuote to Underground Elephant between August and October 2015.

22. Because these "returns" submitted by Underground Elephant were untimely under the terms of the January 2014 Allstate Agreement, and also were made for reasons not permitted under the January 2014 Allstate Agreement, EverQuote rejected them and demanded payment of the outstanding invoices.

23. Underground Elephant has not paid approximately $90,000 due to EverQuote for leads sold pursuant to the January 2014 Allstate Agreement, and continues to withhold even undisputed amounts due unless EverQuote acquiesces to Underground Elephant's purported "return" of leads.

### *The November 2014 Lead Agreement*

24. In November 2014, EverQuote (then known as AdHarmonics, Inc.) and Underground Elephant entered into a Lead Data License Agreement pursuant to which the parties agreed that Underground Elephant would have the opportunity to license certain leads for consumers interested in purchasing insurance products and resell those leads to insurance carriers and agents regardless of affiliation (the "November 2014 Lead Agreement"). A true and correct copy of the November 2014 Lead Agreement is attached as Exhibit B.

25. Contemporaneously with the execution of the November 2014 Lead Agreement, EverQuote and Underground Elephant also executed an Insertion Order to govern the license of leads under the November 2014 Lead Agreement (the "Insertion Order"). A true and correct copy of the Insertion Order is attached as Exhibit C.

26. Underground Elephant agreed in the November 2014 Lead Agreement to integrate its computerized lead processing system with EverQuote's technology platform to facilitate the automatic transmission/receipt of lead data.

27. Underground Elephant agreed in the November 2014 Lead Agreement that EverQuote's technology platform would "ping" Underground Elephant's lead processing system with non-personally identifiable information regarding a lead meeting Underground Elephant's account parameters.

28. Underground Elephant's lead processing system would evaluate this information and provide the price Underground Elephant would be willing to pay for that lead.

29. The November 2014 Lead Agreement had no minimum purchase requirements, and Underground Elephant was not required to return a price. If Underground Elephant offered a

25809659v.2

ping price that was acceptable to EverQuote, then EverQuote would post the complete lead information to Underground Elephant's lead processing system.

30.     Underground Elephant's lead processing system had the option in real-time during the lead post to refuse the lead for any reason or no reason at all.

31.     In other words, before finalizing its license of a lead, Underground Elephant was afforded an opportunity to review all of the lead data and reject the lead. Leads rejected on post are not licensed and thus are not invoiced by EverQuote.

32.     There was never any limit on the number of leads Underground Elephant could reject on post.

33.     This "ping/post" model afforded Underground Elephant the opportunity to provide a price it was willing to pay for a particular lead. Underground Elephant was not required to provide a price for leads it did not want to license.

34.     After EverQuote posted a lead to Underground Elephant, Underground Elephant had a further opportunity to review each and every lead, including all of the information in the lead, to determine whether the lead satisfied its criteria before acquiring a license to the lead and reselling the lead. Leads rejected by Underground Elephant on post were not licensed or invoiced to Underground Elephant.

35.     Underground Elephant agreed in the November 2014 Lead Agreement that licensed leads could only be rejected or returned if permitted under the terms of the Insertion Order, and that if Underground Elephant rejected or returned a lead, then it could not use, sell, or dispose of the lead in any manner.

36.     Underground Elephant agreed in the November 2014 Lead Agreement that EverQuote would invoice Underground Elephant at the end of each calendar month for leads

licensed by Underground Elephant, and that all invoices would be due and payable within 30 days from the date of invoice.

37. Underground Elephant agreed that if any amount set forth on an invoice were the subject of a documentable dispute by Underground Elephant, then Underground Elephant would notify EverQuote of that dispute in writing within seven days after receiving such invoice, and that unless written notice of dispute were provided in writing within that seven day period, the applicable invoice would be deemed accurate, final, due and payable.

38. Underground Elephant agreed in the November 2014 Lead Agreement that it would reimburse EverQuote for any and all amounts expended by EverQuote to collect any amounts due from Underground Elephant, including reasonable attorneys' fees and costs incurred in connection with such collection efforts.

39. EverQuote invoiced Underground Elephant on a monthly basis for leads licensed by Underground Elephant under the terms of the November 2014 Lead Agreement. Each month, Underground Elephant would return a certain percentage of leads for various reasons, and EverQuote would accept returns in accordance with the terms of the November 2014 Lead Agreement.

40. Beginning in September 2015, Underground Elephant continued to submit returns of leads, but failed to pay amounts invoiced by EverQuote for leads licensed by EverQuote to Underground Elephant.

41. In December 2015, and only after EverQuote demanded payment of overdue amounts, Underground Elephant purported to return approximately 26,000 additional leads posted by EverQuote to Underground Elephant.

25809659v.2

42. Because these "returns" submitted by Underground Elephant were untimely under the terms of the November 2014 Lead Agreement, and also were made for reasons not permitted under the November 2014 Lead Agreement, EverQuote rejected them and demanded payment of the outstanding invoices.

43. In December 2015, and again only after EverQuote demanded payment of overdue amounts, Underground Elephant also claimed that approximately 4,500 leads posted by EverQuote to Underground Elephant in 2015 were "duplicates," apparently because they had the same email address associated with them, even though those leads were in every case the product of a unique consumer request for information.

44. Underground Elephant was afforded the opportunity to review every lead, and all information associated with each lead, on post and was able to reject those leads for any reason, including if Underground Elephant deemed the lead to be a "duplicate."

45. Upon information and belief, Underground Elephant resold each of the leads it identified as a "duplicate," and seeks to retain the proceeds of those resale transactions even though it refuses to pay EverQuote for the leads.

46. Underground Elephant has not paid approximately $77,000 due to EverQuote for leads sold pursuant to the November 2014 Lead Agreement, and continues to withhold even undisputed amounts due unless EverQuote acquiesces to Underground Elephant's purported "return" of leads.

47. EverQuote responded in January 2016 to multiple questions from Underground Elephant concerning so-called "duplicate" leads as well as the source of leads posted by EverQuote to Underground Elephant.

25809659v.2

48.     When it became apparent that Underground Elephant was searching for excuses to avoid paying undisputed amounts due, EverQuote filed the pending lawsuit seeking to collect amounts due under the November 2014 Lead Agreement.

49.     Underground Elephant responded by filing its answer and counterclaim in March 2016.  As a result, EverQuote continues to incur fees and costs in order to recover amounts due under the November 2014 Lead Agreement.

## COUNT ONE
### (Breach of January 2014 Allstate Agreement)

50.     EverQuote incorporates by reference paragraphs 1 through 39 of this Amended Complaint as if fully set forth herein.

51.     EverQuote has performed all of its obligations under the January 2014 Allstate Agreement with Underground Elephant.

52.     Underground Elephant breached the January 2014 Allstate Agreement by refusing to pay the sums owed to EverQuote for leads posted by EverQuote to Underground Elephant under the January 2014 Allstate Agreement.

53.     EverQuote is entitled to approximately $90,000, plus interest, for the leads posted to Underground Elephant under the January 2014 Allstate Agreement.

## COUNT TWO
### (Breach of November 2014 Lead Agreement)

54.     EverQuote incorporates by reference paragraphs 1 through 43 of this Amended Complaint as if fully set forth herein.

55.     EverQuote has performed all of its obligations under the November 2014 Lead Agreement with Underground Elephant.

25809659v.2

56. Underground Elephant breached the November 2014 Lead Agreement by refusing to pay the sum owed to EverQuote for its performance under the November 2014 Lead Agreement.

57. EverQuote is entitled to approximately $77,000, plus interest, for the leads posted to Underground Elephant under the November 2014 Lead Agreement.

58. Pursuant to the November 2014 Lead Agreement, EverQuote is also entitled to any and all amounts expended by EverQuote in attempting to collect any amounts due from Underground Elephant, including reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, EverQuote respectfully requests that the Court enter judgment against Underground Elephant as follows:

1. Money damages for unpaid invoices issued by EverQuote under the terms of the January 2014 Allstate Agreement;

2. Money damages for unpaid invoices issued by EverQuote under the terms of the November 2014 Lead Agreement;

3. Interest on the principal outstanding balances due to EverQuote under the January 2014 Allstate Agreement and November 2014 Lead Agreement at the highest rate permitted by law;

4. Reasonable attorneys' fees and costs incurred by EverQuote in attempting to collect the amounts due; and

5. For such further relief as the Court may deem just.

Dated: April 5, 2016

Respectfully submitted,

**EVERQUOTE, INC. f/k/a ADHARMONICS, INC.**

By its attorneys,

*/s/ Brandon L. Bigelow*
Brandon L. Bigelow (BBO# 651143)
bbigelow@seyfarth.com
Alison K. Eggers (BBO# 669548)
aeggers@seyfarth.com
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 300
Boston, MA  02210-2028
Telephone:     (617) 946-4800
Facsimile:     (617) 946-4801

**CERTIFICATE OF SERVICE**

    I hereby certify that on April 5, 2016 a true and correct copy of the foregoing was served electronically through the Electronic Case Filing System and was also sent by e-mail and first class mail to all counsel and/or parties not registered for ECF.

                                                */s/ Brandon L. Bigelow*
                                                Brandon L. Bigelow

25809659v.2